Filed 9/10/21  P. v. Lopez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARIBEL LOPEZ,<br><br>    Defendant and Appellant. | D078266<br><br><br><br>(Super. Ct. No. FVI025720) |

APPEAL from an order of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natatsha Cortina, Lynne G. McGinnis, and Christine L. Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

In 2010, a jury convicted Maribel Lopez and her co-defendant of first degree murder (Pen. Code,[1] § 187, subd. (a)). The court sentenced Lopez to an indeterminate term of 25 years to life in prison.

Lopez appealed and this court affirmed the judgment as to both defendants in an unpublished opinion filed July 15, 2011. (*People v. Peredia et al.* (July 15, 2011, D057745) [nonpub. opn.].)

In 2019, Lopez filed a petition for resentencing under section 1170.95. The court appointed counsel, received briefing, and issued an order to show cause (OSC). Thereafter, the court held a contested evidentiary hearing. In that hearing, the parties agreed the court could consider the record of conviction, which includes this court's prior opinion. At the conclusion of the hearing, the court denied the petition for resentencing. The court found the record proved Lopez was a major participant in the underlying felony and that she acted with reckless indifference to human life.

Lopez appeals challenging the sufficiency of the evidence to prove she acted with reckless indifference to human life. Lopez does not challenge the finding that she was a major participant in the underlying felony. We are satisfied the court correctly found the evidence proved Lopez acted with reckless indifference to human life, beyond a reasonable doubt. There is sufficient evidence to support the trial court's decision. We will affirm the trial court's order denying the petition.

STATEMENT OF FACTS

The respondent's brief contains a factual summary of the offense taken from our prior opinion.[2] (*People v. Peredia et al., supra,* D057745.)

---

[1] All further statutory references are to the Penal Code.

[2] Part B in the facts portion of our prior opinion, which pertains only to Lopez's co-defendant, is not included in the Statement of Facts.

"[E.] Bermudez knew Lopez, liked her, and occasionally gave her drugs. Bermudez disappeared on the night of October 17, 2006. He was driving his Ford Explorer, which had expensive rims and an expensive stereo. Bermudez's mother reported him missing to police the following morning.

"On October 19, 2006, a passerby spotted Bermudez's car on fire and called 911. Authorities responded to the call, extinguished the fire, and impounded the car. The following day, authorities returned to the site and followed tire tracks for about three-tenths of a mile to a second crime scene, where they found another burn pile. They found clothing, paper, a music CD and a fake soda can typically used to hide drugs. On October 22, police interviewed Mr. Barboza, and he eventually gave police information that led them to search a third crime scene in the area around Sanchez Ranch. There, police found drag marks, potential pools of dried blood, and tire tracks matching those found at the two burn sites.

"The trial testimony from Mr. Barboza and his wife showed that around 10:00 p.m. on the night of the murder, Peredia and Lopez came to Barboza's house and asked him to purchase beer for Peredia, but Barboza declined. Peredia and Lopez left but returned a few hours later, arriving around 2:30 a.m. At that time, Peredia told Mr. Barboza that Peredia had gotten into a fight and "offed" someone. Peredia had blood on his pants and was carrying a gun. Peredia wanted Barboza to give him a ride after Peredia dropped off the car he was driving. Barboza eventually agreed to give the requested help, and did follow Peredia for a while, but Barboza ditched Peredia before fulfilling his agreement to give him a ride. The next day, Peredia again contacted Barboza. When they met, Peredia admitted he shot someone in the head, burned the body, and buried it, but claimed he acted in

3

self-defense. He asked Barboza to provide Peredia with an alibi. Barboza eventually gave this information to police.

"On October 26, 2006, police interviewed Jacob and Juan Alvarez, and the information from the Alvarezes led police to the site near Sanchez Ranch where they found Bermudez was buried. Police excavated Bermudez's body the following day. It was naked, charred, and a rope was tied around the ankles. Police found tire treads matching the tire treads found at the other crime scenes.

"The trial testimony from the Alvarez brothers showed that Peredia and Lopez arrived at the Alvarezes' house late on the night of October 17, 2006; Peredia was driving Bermudez's car. Peredia claimed he "blasted" someone for rims and a stereo. He asked for a shovel, rope, and a gas can, which the Alvarez brothers gave to him. The four then drove to a gas station and filled the gas can. They then drove to Sanchez Ranch. On the way to Sanchez Ranch, Peredia again explained he had killed someone and needed help to dispose the body. Peredia said that a drug buy went bad, and he panicked and shot Bermudez in the head and heart. When they arrived at Sanchez Ranch, the Alvarez brothers saw a body stripped of its clothing with bullet holes in the head and chest. They dragged the body into the car and drove off the road into the desert. Peredia stopped, dug a hole, dragged the body into the hole, poured gasoline on it, and set it afire before burying it. Peredia then drove the brothers back to their home and showed them the gun he had used.

"A pathologist conducted an autopsy. Bermudez had been shot twice, once in the chest and once in the head. The chest shot was not fatal. The fatal shot was to the head, and the bullet entered near the right eye and exited near the left ear.

4

"[¶] . . . [¶]

"<u>Lopez's statements to Police (Lopez's Jury Only)</u>

"Lopez was interviewed three times, and her statements were admitted before her jury only.  In the first interview, Lopez denied any involvement in or knowledge of what happened to Bermudez, and denied seeing Bermudez the night of his murder.

"In an interview three days later, Lopez admitted she knew the circumstances surrounding Bermudez's death.  She knew Bermudez was coming to her home, Peredia would also be there, and that Peredia had a gun; and thought Peredia might want to steal something.  When Bermudez arrived, Peredia and Lopez asked him to drive them to a liquor store, but the store was closed when they arrived.  They then drove to the desert.  After arriving, they drank together, but Lopez need to urinate, so she went behind the bushes with some toilet paper.  As she was returning, she heard a gunshot.  When she saw Bermudez had been shot, she ran off, but Peredia caught up to her driving Bermudez's car and told her to get in.  They drove across town, enlisted the aid of two of Peredia's friends, and returned to the scene with gas.  Peredia and his friends dug a hole, and then buried the body. After dropping off Peredia's friends, they returned to the desert in Bermudez's car and slept there.  The next morning, they unloaded Bermudez's possessions and burned them.  They then drove to an aqueduct where Peredia disposed of the gun.

"In a third interview, which Lopez initiated a few weeks later, she told police Peredia knew Bermudez was coming to Lopez's house and Peredia got there before Bermudez.  About a half-hour before Bermudez arrived, Peredia told her he was going to rob Bermudez and showed her a gun he was carrying, but promised not to kill Bermudez.  At some point, Peredia

5

threatened to shoot or hit Lopez if she did anything stupid. Peredia asked whether there was any way Bermudez would accompany Peredia without Lopez, but she responded he would not go with Peredia because he did not know him, and that she would have to accompany them to create the opportunity for Peredia to rob Bermudez."

## DISCUSSION

As we have observed, there is only one issue before us in this appeal. Is there sufficient evidence in the record to support the finding that Lopez acted with reckless indifference to human life? We think there is sufficient substantial evidence to support the finding and thus the denial of the petition.

### A. Legal Principles

Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437) was enacted to "amend[ ] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*People v. Gentile* (2020) 10 Cal.5th 830, 842.)

Section 1170.95, subdivision (c) provides: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. These deadlines shall be extended for good

6

cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

When we review a challenge to the sufficiency of the evidence to support a factual finding we apply the substantial evidence standard of review. We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. (*People v. Clements* (2021) 60 Cal.App.5th 597, 618, review granted Apr. 28, 2021, S267624; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.)

In determining whether the record shows a defendant acted with reckless indifference to human life, we look to our Supreme Court's decisions in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). While those were death penalty cases, the term reckless indifference to human life is used in Senate Bill 1437 in examining whether murder liability can be imposed on a person who is not the killer.

The court in *Banks* stated that "[a] sentencing body must examine the defendant's *personal* role in the crimes leading up to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks*, *supra*, 61 Cal.4th at p. 801.)

*Banks*, provided a list of some of the factors a reviewing court should consider in assessing the defendant's role: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a

7

position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803.)

In *Clark*, the court expanded on the factors relevant to establishing reckless indifference. Those factors include, but are not limited to, the defendant's knowledge of weapons used in the crime, how those weapons were used; the number of weapons used; the defendant's proximity to the crime; his opportunity to stop the killing or aid the victim; the duration of the crime; and the defendant's efforts, if any, to minimize the possibility of violence during the crime. (*Clark*, *supra*, 63 Cal.4th at pp. 618-623.)

## B. Analysis

Lopez's role as a major participant in the underlying felony is not disputed. Indeed, the crime could not have been committed without her participation. The victim knew and trusted Lopez and did not know her cohort. It is conceded the victim would not have gone with the accomplice without Lopez being present. Lopez knew the accomplice planned a robbery at gun point. They discussed how to deal with the victim. According to Lopez, the accomplice promised not to shoot but would take the victim out in the desert to get him lost. The trial court could infer Lopez and her accomplice had a practical problem. Robbing someone who knows your name and can identify you requires that something be done to prevent the victim from going to the police. She and the accomplice discussed whether to shoot him or "lose him in the desert," presumably to die.

The encounter with the victim appears to have lasted a while including some drinking and a drive into the desert at night. Although Lopez claims she was outside the vehicle when the victim was murdered, she was plainly

aware from the outset that some fatal action would have to take place to prevent the victim identifying them to police.  She did nothing to minimize the risk that the victim would be killed.

On this record, the trial court could reasonably find, beyond a reasonable doubt, that Lopez acted with reckless indifference to life as that term has been defined by the high court in *Banks* and *Clark*.

DISPOSITION

The order denying Lopez's petition for resentencing under section 1170.95 is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

9